UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DOUGLAS MACARTHUR GUILE, II,

        Plaintiff,

v.

T. SPENCE, et al.,

        Defendants.

_____/

Case No. 2:19-cv-138

Hon.  Robert J. Jonker
Chief U.S. District Judge

## REPORT AND RECOMMENDATION

### I.   Introduction

This Report and Recommendation (R&R) addresses Defendant Corrections Officers (COs) Spence and Rolison's motion for summary judgment.  (ECF No. 37.)

Plaintiff in this case — state prisoner Douglas MacArthur Guile, II — initiated this civil rights action pursuant to 42 U.S.C. § 1983 on July 2, 2019.  (ECF No. 1.) Guile initially named eight defendants across five claims arising out of incidents that occurred during his incarceration at the Chippewa Correctional Facility (URF) in Kincheloe, Michigan.  In its September 12, 2019 Opinion (ECF No. 4) and Order (ECF No. 5), this Court dismissed all but Guile's claim that COs Spence and Rolison utilized excessive force against him by deploying an electronic control device (ECD)[1] against him after he was assaulted by another prisoner.  In their motion for summary judgment, Defendants assert that they came upon what appeared to be not an assault

---

[1]    Electronic control devices are more commonly referred to as tasers.

but a fight, ordered the prisoners to stop and lay on the ground, and tased the closest prisoner when neither complied. (ECF No. 38, PageID.221.) Defendants also claim that they are entitled to qualified immunity. (*Id.*, PageID.227-228.)

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment because there are no genuine issues of fact for which a reasonable jury could find Defendants utilized excessive force against Guile, and Defendants are entitled to qualified immunity.

## II.  Factual Accounts

There are three factual accounts to consider in this R&R: Guile's, Defendants', and a videorecording of the incident.

### a.  Guile's Factual Allegations

In his verified complaint, Guile asserts that, beginning in late May of 2019, his relationship with CO Spence turned hostile when Spence became threatened by his intelligence. (ECF No. 1, PageID.3.) This hostility manifested in "debasing comments" towards Guile and, eventually, in Spence directing CO Rolison to tase Guile after Guile was assaulted by another inmate. (*Id.*, PageID.3,4.)

The incident at issue occurred on June 20, 2018, in one of the facility's card rooms. (*Id.*) According to Guile, he was sitting playing cards with a friend when a prisoner he did not know walked into the room and began punching him in the head, eventually knocking him off his seat. (*Id.*, PageID.4.) Guile covered his face and began kicking his feet to deflect the attack. (*Id.*) Meanwhile, Defendants entered the room. Guile says that at this point, the other inmate stopped assaulting him, and

stood approximately five feet away. (*Id.*) Nevertheless, Guile says that CO Spence directed CO Rolison to tase Guile as he laid on his side on the floor. Guile says that the video captured CO Spence's command. (*Id.*, PageID.5.) The attack left Guile in need of twelve stitches (*id.*), and CO Rolison's use of his ECD against Guile left him with a small hole in his back and muscle soreness for several days. (ECF No. 38-2, PageID.237).

### b. Defendants' Factual Allegations

In contrast, Defendants recount entering the URF card room and witnessing what they believed to be an ongoing fight between Guile and another prisoner. (ECF No. 38-3, PageID.240-241; ECF No. 38-4, PageID.243-244.) After CO Rolison commanded the two men to stop fighting and lay on the ground, and the men did not comply, CO Rolison tased the closest of the two prisoners, which happened to be Guile. (ECF No. 38-4, PageID.244.)

In his affidavit, CO Spence further asserts that he never displayed animus towards Guile, or otherwise intended to utilize excessive force against him during the June 20 incident. (ECF No. 38-3, PageID.241.) Spence says that while he did direct CO Rolison to deploy his ECD after the prisoners did not comply with the order to stop fighting, he never specifically directed Rolison to tase Guile. (*Id.*)

According to an affidavit executed by CO Rolison, the fight occurred in the vicinity of dozens of other prisoners, and he deployed his ECD with the sole aim of ending the fight and restoring discipline within the unit. (ECF No. 38-4, PageID.244.)

3

### c. The Videorecording

The videorecording shows that on June 20, 2018, at 6:48 p.m., Guile sat at a table just inside URF's card room. (Defs.' Exh. D at 18:48:36.) Approximately twenty-eight other inmates sat or stood around the room. Seconds later, two inmates walked in and the second, seemingly without warning or provocation, began punching Guile. (*Id.* at 18:48:40.) Guile responded by kicking his legs out in an apparent attempt to keep the other inmate at bay. (*Id.* at 18:48:45.)

Approximately eight seconds after the inmate first entered the room and began punching Guile, COs Spence and Rolison entered the card room. (*Id.* at 18:48:48.) At this point, the inmate was positioned on top of Guile, punching him. Guile was kicking and flailing his arms. CO Rolison then drew his ECD, while CO Spence pointed in the direction of the two men. (*Id.* at 18:48:51.) At the time, Guile was positioned closer to where the COs stood. It is difficult to discern exactly when CO Rolison deployed the ECD.

### III. Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Cmty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421

F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005).

## IV.   Eighth Amendment Analysis

The Eighth Amendment embodies a constitutional limitation on the power of the states to punish those convicted of a crime. Punishment may not be "barbarous", nor may it contravene society's "evolving standards of decency." *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981); *Trop v. Dulles*, 356 U.S. 86, 101 (1958). The Eighth Amendment also prohibits conditions of confinement which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain." *Rhodes*, 452 U.S. at 346. Among unnecessary and wanton inflictions of pain are those that are "totally without penological justification." *Id.*

To establish an Eighth Amendment claim, a plaintiff must satisfy both an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Wilson v. Seiter*, 501 U.S. 294, 297-300 (1991). "The objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011) (quoting *Wilson*, 501 U.S. at 298). "The subjective component focuses on the state of mind of the prison officials." *Williams v. Curtin*, 631 F.3d at 383.

While all Eighth Amendment claims involve an objective and a subjective component, the objective component is contextual and therefore varies depending on

5

the claim asserted. *Hudson v. McMillian*, 503 U.S. 1, 8-9 (1992). The degree of harm necessary to satisfy the objective component depends on "contemporary standards of decency." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976). Not "every malevolent touch by a prison guard gives rise to an Eighth Amendment cause of action." *Hudson*, 503 U.S. at 9. But when prison or jail officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated, "[w]hether or not significant injury is evident." *Id.* Thus, while the extent of an inmate's injury may help determine the amount of force used by the prison or jail official, it is not dispositive of whether an Eighth Amendment violation based on excessive force has occurred. *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). The essential inquiry for an Eighth Amendment claim of excessive force is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986).

Defendants assert that Guile cannot meet the objective or subjective component of his Eighth Amendment claim because the COs utilized minimum force to separate Guile and his attacker, and nothing on the record suggests that the COs acted with animosity in employing that force. (ECF No. 38, PageID.226-227.) There are two significant differences between Guile's factual account of the incident underlying this case and Defendants' factual account that bear on the nature of the force employed: first, whether the fight had ceased by the time CO Rolison deployed his ECD, and second, whether CO Spence directed Rolison to deploy the ECD against Guile based on pre-existing animus between Spence and Guile.

6

The undersigned reiterates that it is unclear when exactly the ECD is deployed in the video provided by Defendants. However, the Critical Incident Reports (ECF No. 1-2, PageID.32-38) and Electronic Control Devise Usage Report (ECF No. 1-2, PageID.46) provided by Guile all state that the altercation ended only after CO Rolison deployed his ECD. Defendants' affidavits state the same. (ECF No. 38-3, PageID.241; ECF No. 38-4, PageID.244.) Furthermore, the video shows that Guile and the inmate who attacked him did not immediately separate when the COs entered the card room. (Defs.' Exh. D at 6:48:48.) Instead, when CO Spence gestured for Rolison to tase one of the men, the inmate still had a hold of Guile's collar and Guile was still attempting to deflect his blows. (*Id.* at 6:48:52.) In Guile's complaint, he indicates that CO Rolison deployed his ECD upon Spence's instruction. (ECF No. 1, PageID.4-5.) Taking the reports, affidavits, and video together, Guile's allegations that the CO Rolison deployed his ECD after the altercation had ended are insufficient to create a genuine issue of fact.

The fact that the altercation was ongoing when CO Spence gestured to CO Rolison to deploy his ECD also bears on Guile's allegations of animus on the part of Spence. To support the subjective component of his excessive force claim, Guile asserts that he had prior unfavorable interactions with CO Spence, and that Spence specifically directed CO Rolison to tase him even though the altercation was over. (*Id.*, PageID.4.) Then, in his deposition, Guile clarifies that CO Spence did not specifically tell CO Rolison "tase Guile" but instead said "taser, taser" while facing Guile's direction. (ECF No. 38-2, PageID.235, 237.) But the video shows that at the

7

time Spence gestures for Rolison to deploy his ECD, Defendants are facing the direction of both men, who are still engaged in a struggle. (*Id.* at 6:48:52.) As set forth in CO Rolison's affidavit (ECF No. 38-4, PageID.244), Guile happens to be closer to the COs at the time. (Defs.' Exh. D at 6:48:52.) Even accepting that Guile and Spence did not get along prior to the incident, a reasonable jury could not find that CO Spence stating "taser, taser" while facing both inmates establishes that the COs maliciously deployed the ECD to cause Guile harm.

Furthermore, though Guile asserts in his complaint that he needed twelve stitches following the incident (ECF No. 1, PageID.5), he makes clear in his deposition that the only injuries he had from being tased were a hole in his back and a bit of soreness over the next few days (ECF No. 38-2, PageID.237). He also makes clear that he was given immediate medical attention following the incident. "The objective component [of an excessive force claim] requires that the use of force be more than de minimis." *Alexander v. Ojala*, No. 17-2357, 2018 WL 5905588, at *3 (6th Cir. May 29, 2018) (finding that the use of a taser to stop an altercation, which resulted in pain, muscle cramps, and difficulty sleeping, was de minimis despite plaintiff's assertion that he had stopped actively fighting when he was tased). Given the circumstances here, the undersigned finds that CO Rolison's deployment of his ECD did not amount to more than a de minimis use of force.

The undersigned is sympathetic to Guile's frustration at being tased immediately following an unprovoked attack. This was obviously a very bad day for him. But evaluating Defendants' conduct in hindsight, with the knowledge that Guile

was the victim of an attack rather than an aggressor, would be "the very sort of after-the-fact second-guessing that the Supreme Court has instructed courts to avoid." *Graham v. Turner*, No. 1:16-CV-149, 2019 WL 5273760, at *5 (W.D. Mich. Aug. 19, 2019), *report and recommendation adopted*, No. 1:16-CV-149, 2019 WL 4621976 (W.D. Mich. Sept. 24, 2019) (citing *Whitley*, 475 U.S. at 322). The video of the incident, paired with the Defendants affidavits, shows that COs Spence and Rolison were attempting to restore order in a room containing thirty inmates. Only forty-nine seconds passed between the start of the assault, and the other inmate's escort out of room. (Def.'s Exh. D at 6:48:36-6:49:25.) Defendants were not in the room when the attack began, and it was not obvious upon their entry that Guile was simply trying to deflect the punches being thrown at him. And when CO Spence gestured for CO Rolison to deploy his ECD, the altercation was ongoing. Simply put, there are no genuine issues of fact for which a reasonable jury could find the use of force underlying this case was excessive.[2]

---

[2] The undersigned notes that in addition to his substantive arguments, Guile asserted that Defendants' motion for summary judgment was untimely, and that their attachment of the videorecording was not properly authenticated. (ECF No. 39, PageID.248-250.) But Defendants' motion complied with this Court's amendment to its Case Management Order. (ECF No. 31.) And Defendants put sufficient evidence on the record to support a finding that the video is what they claim it is by including an affidavit from CO Spence identifying the video and its contents. Fed. R. Evid. 901(a). The other evidentiary rules cited by Guile are not relevant to the videorecording.

## V. Qualified Immunity

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Phillips v. Roane Cty.*, 534 F.3d 531, 538 (6th Cir. 2008) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Once a defendant raises the qualified immunity defense, the burden shifts to the plaintiff to demonstrate that the defendant officer violated a right so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Analyzing claims of qualified immunity involves a two-pronged test. *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). First, the court must "determine if the facts alleged make out a violation of a constitutional right." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (1982)). Second, the court asks if the right at issue was "'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it." *Id.* (citing *Pearson*, 555 U.S. at 232). A court may address these prongs in either order. *Id.* (citing *Pearson*, 555 U.S. at 236). A government official is entitled to qualified immunity if the court finds that there is no constitutional violation, or that the right at issue was not clearly established. *See Citizens in Charge, Inc. v. Husted*, 810 F.3d 437, 440 (6th Cir. 2016).

In applying the first prong of the qualified immunity analysis, a court must identify "the specific constitutional right allegedly infringed" and determine whether a violation occurred. *Graham v. Connor*, 490 U.S. 386, 394 (1989). The court considers the state of the law at the second prong. As the Supreme Court has observed, "this Court's case law does not require a case directly on point for a right to be clearly established, [but] existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S. Ct. 548, 551 (2017) (internal quotation marks and original brackets omitted) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)). As explained by the Supreme Court:

> To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," *Hunter v. Bryant*, 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam), which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority,' " *al–Kidd, supra*, at 741–742, 131 S.Ct. 2074 (quoting *Wilson v. Layne*, 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *See Reichle*, 566 U.S., at 666, 132 S.Ct. 2088. Otherwise, the rule is not one that "every reasonable official" would know. *Id.*, at 664, 132 S.Ct. 2088 (internal quotation marks omitted).
>
> The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). This requires a high "degree of specificity." *Mullenix v. Luna*, 577 U.S. ——, ——, 136 S.Ct. 305, 309, 193 L.Ed.2d 255 (2015) (per curiam). We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." *Plumhoff, supra*, at 2023

11

(internal quotation marks and citation omitted). A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established." *Anderson, supra*, at 641, 107 S.Ct. 3034. In the context of a warrantless arrest, the rule must obviously resolve "whether 'the circumstances with which [the particular officer] was confronted ... constitute[d] probable cause.'" *Mullenix, supra*, at 309 (quoting *Anderson, supra*, at 640–641, 107 S.Ct. 3034; some alterations in original).

*District of Columbia v. Wesby*, 138 S. Ct. 577, 589–90 (2018).

Because the undersigned finds that there are no genuine issues of material fact, and Defendants did not utilize excessive force, the undersigned finds that Defendants are entitled to qualified immunity on Guile's claims.

## VI. Recommendation

The undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment and dismiss this case.

Dated: February 4, 2022  /s/ *Maarten Vermaat*
MAARTEN VERMAAT
U. S. MAGISTRATE JUDGE

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).